# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOSEPH WHITE,<br>　　　　Plaintiff<br><br>　　v.<br><br>TIMKEN GEARS AND SERVICES,<br>INC.,<br>　　　　Defendant | No. 21 CV 2290<br><br>Judge Jeremy C. Daniel |

## MEMORANDUM OPINION AND ORDER

Plaintiff Joseph White was terminated from his employment at Timken Gears and Services, Inc. ("Timken") after testing positive for marijuana following a random drug test pursuant to company policy. White filed suit against Timken, alleging that the circumstances giving rise to his termination violated the Illinois Right to Privacy in the Workplace Act ("IRPWA"), 820 ILCS 55/1, *et seq.*[1] The parties filed cross-motions for summary judgment. (R. 59; R. 64.)[2] For the reasons below, Timken's motion is granted, and White's motion is denied.

---

[1] White filed his complaint in the Circuit Court of the Twelfth Judicial Circuit, Will County, Illinois, (R. 1-1), and Timken subsequently removed the action to this Court. (R. 1.) The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between parties and the amount in controversy exceeds $75,000. (*Id.* ¶¶ 4–5, 10.)

[2] For CM/ECF filings, the Court cites to the page number(s) set forth in the document's CM/ECF header unless citing to a particular paragraph or other page designation is more appropriate.

## BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 submissions,[3] the materials cited therein, and other aspects of the record in this case. All facts are genuinely undisputed unless otherwise noted.

Timken is a company that develops, manufactures, and sells a variety of industrial motion products, including augers, belts, brakes, clutches, gear drives, and transmissions. (Pl.'s SOF ¶ 5; R. 60 at 2.) White worked for Timken as a Territory Account Manager, selling gearboxes and gearbox repair services. (Def.'s SOF ¶ 7; R. 63-1 ("White Dep.") at 22:20–23:05.) In this role, White worked from home, but reported to the company's regional service center in Mokena, Illinois. (Def.'s SOF ¶ 8; R. 14 ¶ 2; R. 63-10.) He also drove a company car to visit customers and prospective customers at their facilities. (Def.'s SOF ¶ 9.)

At all relevant times, Timken maintained an Associate Handbook for its employees. (Pl.'s SOF ¶ 10; Def.'s SOF ¶ 10; *see generally* R. 61-2 ("Associate Handbook").) White received the Associate Handbook in June 2019. (Def.'s SOF ¶ 10; White Dep. at 25:05–09, 27:03–07.) The Associate Handbook contains Timken's Drug and Alcohol Policy, which provides that "[t]he company has a policy of maintaining a

---

[3] *See* Defendant's Statement of Undisputed Material Facts, (R. 61 ("Def.'s SOF")); Plaintiff's Statement of Undisputed Material Facts, (R. 66 ("Pl.'s SOF")); Defendant's Statement of Additional Undisputed Material Facts, (R. 72 ("Def.'s SOAF")); Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, (R. 76 ("Pl.'s Response to Def.'s SOF")); Plaintiff's Statement of Additional Undisputed Material Facts, (R. 77 ("Pl.'s SOAF")); Defendant's Answer to Plaintiff's Statement of Undisputed Material Facts, (R. 78 ("Def.'s Response to Pl.'s SOF")); Defendant's Answer to Plaintiff's Statement of Additional Undisputed Material Facts, (R. 80 ("Def.'s Response to Pl.'s SOAF")); and Plaintiff's Response to Defendant's Statement of Additional Undisputed Material Facts, (R. 82 ("Pl.'s Response to Def.'s SOAF")).

drug-free workplace and strictly prohibits the unlawful manufacture, distribution, dispensation, possession or use of controlled substances or alcohol in the workplace." (Associate Handbook at 19.) The Policy identifies marijuana as a controlled substance. (*Id.* at 20; Def.'s SOF ¶ 1.) Timken also maintains a "random testing program" pursuant to which employees at its manufacturing and distribution centers are randomly selected for drug screenings. (R. 62 ("Medical Procedure Manual") at 52; Def.'s SOF ¶ 2.)

"Testing positive for a controlled substance" is among the prohibited activities listed in the Associate Handbook's Drug and Alcohol Policy. (Associate Handbook at 20–21; Def.'s SOF ¶ 3.) For employees who test positive, Timken offers an Employee Assistance Program through which employees are required to stop using the substance for which they tested positive, participate in counseling, and submit to subsequent, unannounced testing. (Pl.'s SOF ¶ 16; Associate Handbook at 21; R. 66-4 ("O'Beirne Dep.") at 75:04–77:03.) Timken's Drug and Alcohol Policy provides that "[t]esting positive following the first rehabilitation for unauthorized drug and/or alcohol abuse or dependency . . . will result in immediate termination of employment." (Associate Handbook at 22; Def.'s SOF ¶ 5.) The company's drug and alcohol testing protocols were developed with the assistance of a medical review officer, Richard Reicher, M.D. (Def.'s SOF ¶ 6; R. 63 ("Brode Dep.") at 39:01–10.)

In December 2019, Timken informed White that he had been selected to submit to a random drug test. (Def.'s SOF ¶ 11; Pl.'s SOF ¶ 24.) On December 6, 2019, White provided a urine specimen to MMCH Occupational Health Services in Batesville,

3

Indiana, which yielded a positive result for marijuana. (Def.'s SOF ¶ 13; Pl.'s SOF ¶ 27; R. 63-3.) Following the positive result, White participated in Timken's Employee Assistance Program. (Pl.'s SOF ¶ 28.) He received notice of the program's requirements on December 11, 2019. (Def.'s SOF ¶ 19; R. 63-4.) The notice provides that employees may be subject to additional random drug testing for a period of ninety days following their return to work. (Def.'s SOF ¶ 20; R. 63-4.) This reflects the policy that employees are typically suspended from work pending completion of the Employee Assistance Program. (Def.'s SOF ¶ 21; Pl.'s SOF ¶ 17.) White, however, was permitted to continue working at the company following his positive test, though he was not permitted to drive the company car. (Def.'s SOF ¶¶ 15, 18, 22; Pl.'s SOF ¶ 31; White Dep. at 43:20–45:01.)

As part of the Employee Assistance Program, White met with a substance abuse counselor on three occasions. (Def.'s SOF ¶ 23; Pl.'s SOF ¶ 29; White Dep. at 42:11–14.) He also submitted to another drug test on January 6, 2020, which yielded a negative result for marijuana. (Def.'s SOF ¶ 24; R. 63–5.) It is Timken's policy to require an employee who produces a positive drug test to submit to additional testing until a negative result is generated to ensure that a subsequent positive result from the same initial substance use is not counted against them. (Pl.'s Response to Def.'s SOF ¶ 26; Brode Dep. at 37:19–38:10.) Once a negative result is generated, Timken tests the employee more frequently to confirm that they continue to be drug free. (Pl.'s Response to Def.'s SOF ¶ 26; Brode Dep. at 38:13–16; 39:01–10.)

4

Pursuant to this policy, White was required to re-test on January 21, 2020. (Def.'s SOF ¶ 27; Pl.'s SOF ¶ 33.) This test yielded a negative dilute result. (Def.'s SOF ¶ 27; Pl.'s SOF ¶ 33; R. 63-6.) Timken treats a negative dilute test as a failed test and provides the employee the opportunity to re-test to determine whether the dilution was intentional. (Def.'s SOF ¶ 29; Brode Dep. at 37:07–09, 39:24–40:19.) On January 24, 2020, White tested again and yielded a second negative dilute result. (Def.'s SOF ¶ 31; Pl.'s SOF ¶ 34; R. 63-7.) Following the second negative dilute result, Tommie Jo Brode, Timken's Manager of Worker's Compensation, Disability and Occupational Health, attempted to contact White by phone to request an explanation for his test results. (Def.'s SOF ¶ 33; Brode Dep. at 10:04–06, 48:12–49:09.) Brode was unable to reach White by phone, so she followed up via email on January 27, 2020. (Def.'s SOF ¶ 33; R. 63-8.) White did not respond. (R. 60 at 5.)

Timken allows its employees only one re-test following a negative dilute result. (Def.'s SOF ¶ 34; Brode Dep. at 37:07–09.) If a second negative dilute result is generated following the re-test, it is Timken's standard practice to terminate the employee. (Def.'s SOF ¶ 35; Brode Dep. at 37:07–14.) Timken, however, permitted White to take a third test on January 27, 2020, notwithstanding his previous two negative dilute test results. (Def.'s SOF ¶ 35; Brode Dep. at 43:15–16.) That test yielded a positive result for marijuana. (Def.'s SOF ¶ 36; Pl.'s SOF ¶ 35; R. 63-9.)

On February 4, 2020, Timken terminated White from his employment for violating the company's Drug and Alcohol Policy. (Def.'s SOF ¶ 37; Pl.'s SOF ¶¶ 36–37; R. 63-10.) Following his termination, White filed a complaint with the Illinois

5

Department of Labor. (Pl.'s SOF ¶ 38; R. 66-1 ("Compl.") ¶¶ 16–17.) The Illinois Department of Labor issued White a right to sue letter on January 25, 2021. (Pl.'s SOF ¶ 38; Compl. ¶ 18.) This suit followed.

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A fact is 'material' if it is one identified by the law as affecting the outcome of the case." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 722 (7th Cir. 2015). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In ruling on a motion for summary judgment, the Court "construe[s] all facts and draw[s] all reasonable inferences in the nonmoving party's favor, but the moving party may prevail 'by showing an absence of evidence to support' the nonmoving party's claims." *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (quoting *Tyburski v. City of Chi.*, 964 F.3d 590, 597 (7th Cir. 2020)). The Court gives the nonmoving party "the benefit of reasonable inferences from the evidence," but it does not construe "speculative inferences in his favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016). "Where, as here, the parties file cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made." *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017) (citing *Dunnet Bay Constr. Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir. 2015)).

6

## ANALYSIS

White alleges that Timken violated the IRPWA when it terminated him for testing positive for marijuana. The IRPWA prohibits an employer from firing an employee "because the individual uses lawful products off the premises of the employer during nonworking and non-call hours." 820 ILCS 55/5(a). "Lawful products" for purposes of the IRPWA are "products that are legal under state law," *id.*, which, as of January 1, 2020, includes cannabis pursuant to Illinois' Cannabis Regulation and Tax Act ("CRTA"), 410 ILCS 705/1-1, *et seq.*

But the IRPWA contains a critical exemption. It excludes from its reach "Section 10-50 of the Cannabis Regulation and Tax Act . . ." 820 ILCS 55/5(a). Section 10-50 of the CRTA governs employment and employer liability—it sets forth what employers can and cannot do following cannabis' legalization. That is the crux of the parties' dispute here—whether, under Section 10-50 of the CRTA, Timken could terminate White for testing positive for marijuana pursuant to a random drug test in accordance with Timken's Drug and Alcohol Policy.

The starting point in deciding this issue is interpretation of the statute. As a federal court exercising diversity jurisdiction, the Court must apply Illinois substantive law. *Webber v. Butner*, 923 F.3d 479, 482 (7th Cir. 2019). Neither the Illinois Supreme Court nor the Illinois Appellate Court has had occasion to resolve the question presented in this case. Accordingly, this Court's job is to best predict how the Illinois Supreme Court would interpret the statutory provisions at issue here. *See Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 319 (7th Cir. 2021).

7

In Illinois, issues of statutory interpretation are questions of law. *Miller v. Dep't of Agric.*, __ N.E.3d __, 2024 IL 128508, ¶ 30 (Ill. 2024). "[T]he primary goal in construing a statute is to ascertain and give effect to the legislature's intent," the best indicator of which "is the language of the statute itself." *Carmichael v. Laborers' & Ret. Bd. Emps.' Annuity & Benefit Fund of Chi.*, 125 N.E.3d 383, 393 (Ill. 2018). Words or phrases used in the statute cannot be viewed in isolation, rather, they must be considered "in light of other relevant provisions of the statute." *Mosby v. Ingalls Mem'l Hosp.*, 234 N.E.3d 110, 118 (Ill. 2023). "When the statutory language is plain and unambiguous, a court may not 'depart from a statute's plain language by reading into the law exceptions, limitations, or conditions that the legislature did not express.'" *Id.* (quoting *Schultz v. Ill. Farmers Ins. Co.*, 930 N.E.2d 943, 953 (Ill. 2010)). "Nevertheless, in construing a statute, the court may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another." *McDonald v. Symphony Bronzeville Park, LLC*, 193 N.E.3d 1253, 1261 (Ill. 2022).

Viewing Section 10-50 as a whole, there are three provisions relevant to the issue of whether Timken could randomly drug test and terminate White for testing positive for marijuana under its Drug and Alcohol Policy. The first is subsection (a). Subsection (a) authorizes employers to adopt drug policies. *See* 410 ILCS 705/10-50(a). It provides:

> Nothing in this Act shall prohibit an employer from adopting reasonable zero tolerance or drug free workplace policies, or employment policies concerning drug testing, smoking, consumption, storage, or use of cannabis in the

8

>workplace or while on call provided that the policy is applied in a nondiscriminatory manner.

*Id.*

The plain language of subsection (a) expressly permits two categories of policies: "zero tolerance or drug free workplace policies" or "employment policies concerning . . . in the workplace or while on call." *Id.* Significant, here, is the legislature's use of "or" to separate two clauses containing the word "policies." The word "or" is disjunctive; it indicates an alternative between two or more options. *See Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018) (explaining the word "or" is "almost always disjunctive"); *United States v. Draheim*, 958 F.3d 651, 657 (7th Cir. 2020) (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 116 (2012) ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives.")); *Mosby*, 234 N.E.3d at 119 ("As used in its ordinary sense, the word 'or' marks an alternative indicating the various parts of the sentence which it connects are to be taken separately.").

Further, by using the word "policies" twice, the legislature confirmed that each of the two clauses separated by the disjunctive "or" describes a different category of permissible policies. *See, e.g., Mosby*, 234 N.E.3d at 119 (explaining the statute's use of the word "or" to separate two clauses that each contained the word "information" indicated the legislature's intent to exempt two different specified categories of information). Significantly, "in the workplace" appears only in the latter of these two clauses describing "employment policies concerning [drug-related conduct]"; it does not modify the clause describing "zero tolerance or drug free workplace policies."

9

Consequently, the plaintiff's argument that Subsection (a) limits employers to adopting zero tolerance or drug free workplace policies that proscribe only "in the workplace" conduct fails.

Next is subsection (c), which provides that "[n]othing in [the CRTA] shall limit or prevent an employer from disciplining an employee or terminating employment of an employee for violating an employer's employment policies or workplace drug policy." 410 ILCS 705/10-50(c). The import of this section is clear—Section 10-50 not only authorizes employers to adopt drug policies, but it also authorizes employers to terminate employees for violating them.

Finally, there's subsection (e)(1), which provides:

> (e) Nothing in this Act shall be construed to create or imply a cause of action for any person against an employer for:
> (1) actions taken pursuant to an employer's reasonable workplace drug policy, including but not limited to subjecting an employee or applicant to reasonable drug and alcohol testing, reasonable and nondiscriminatory random drug testing, and discipline, termination of employment, or withdrawal of a job offer due to a failure of a drug test . . .

410 ILCS 705/10-50(e)(1). By its plain language, subsection (e)(1) precludes claims against employers for certain actions taken pursuant to their drug policies. This list of actions is non-exhaustive, but critical among them is "reasonable and nondiscriminatory random drug testing." *Id.* A plain reading of this provision thus indicates that an employer may enforce its drug policies through random drug testing so long as the testing is (1) reasonable and (2) nondiscriminatory. *Cf. Draheim*, 958 F.3d at 657 ("Generally, the joinder of two clauses with the word 'and,' not 'or,' means that the legislature intended that a potential candidate for statutory relief fulfill both

10

clauses, not just one."). Read together with subsections (a) and (c), Section 10-50 of the CRTA provides that: employers may adopt a zero tolerance or drug free workplace policy; zero tolerance or drug free workplace policies need not be tied to "in the workplace" conduct; such policies may be enforced through reasonable and nondiscriminatory random drug testing; and an employee may be terminated for violating the employer's drug policy.[4] 410 ILCS 705/10-50(a), (c), (e)(1).

In this case, Timken had what it describes as a "drug-free workplace" policy, which White refers to as a "zero tolerance" policy. (*See* R. 65 at 3.) Either way, they fall within the first category of policies named in Section 10-50(a). Timken enforced its Drug and Alcohol policy through random drug testing. The policy informs employees that they are expected to abide by "random or other drug screening polic[ies]" and prohibits employees from "[t]esting positive for a controlled substance . . . or otherwise violating the drug and alcohol policy." (Associate Handbook at 29, 31.) Such a policy is permissible under the plain language of subsection (a), as is its enforcement through random drug testing—so long as such testing is reasonable and nondiscriminatory. 410 ILCS 705/10-50(a), (e)(1).

---

[4] This interpretation is also consistent with the legislative history. During a legislative debate in the Illinois Senate, the bill's sponsor explained that the purpose of adding Section 10-50 of the CRTA as an exception under the IRPWA was "to allow employers who provide a zero tolerance or drug-free workplace policy to implement and enforce their policy without fear of violating the Right to Privacy in the Workplace Act." *See* 101st Ill. Gen. Assem., Senate Proceedings, May 29, 2019, at 64–65. This refrain was repeated at a debate in the Illinois House of Representatives during which the legislators confirmed that the CRTA "just affirms the existence and the right for employers to have zero-tolerance policies. It doesn't change the status quo with regard to the ability to have a zero-tolerance policy." *See* 101st Ill. Gen. Assem., House Proceedings, May 31, 2019, at 37–38.

11

Thus, to maintain a cause of action against Timken, White must show that Timken's random drug testing protocols were either discriminatory or unreasonable. There is no dispute that White was not selected for random drug testing based on a legally protected characteristic. (Pl.'s Response to Def.'s SOF ¶ 12.) Rather, the only issue before the Court is whether Timken's drug testing protocols were unreasonable. (R. 65 at 1.) Nothing in this record shows that they were.

First, White acknowledges receipt of Timken's Associate Handbook, which contains its Drug and Alcohol Policy. White was therefore on notice that Timken had either a drug-free or zero tolerance policy, that he was expected to abide by that policy and was subject to the company's random drug testing procedures, and that he could be terminated should he test positive for a controlled substance, including marijuana. Providing employees notice of the Drug and Alcohol Policy, advising them of random drug testing procedures, and advising them of the consequences of failing to abide by the Drug and Alcohol Policy is reasonable.

Under its Drug and Alcohol Policy, Timken does not immediately terminate employees following their first positive test. Rather, it gives employees the opportunity to rehabilitate themselves through its Employee Assistance Program. Again, White acknowledges receipt of the program's requirements, including that he would be subject to additional, random drug testing. Critically, Timken's policy requires a negative test result before holding employees accountable for a second violation of its Drug and Alcohol Policy. It is only if an employee "test[s] positive following the first rehabilitation for unauthorized drug . . . abuse" that they may be

subject to termination. (Associate Handbook at 32.) Providing employees the opportunity to provide a clean test before administering additional, random drug screenings is fair and reasonable.

White does not dispute that Timken adhered to its standard practice in his case. In fact, he acknowledges being given more chances to comply with Timken's Drug and Alcohol Policy than are typically provided. For example, while it is Timken's policy to terminate an employee following two negative dilute test results, White was given the opportunity to explain his results and take a third test. Not only did White decline to provide an explanation, but his third test yielded a positive result for marijuana. It was only after being given multiple chances to comply with its Drug and Alcohol Policy that Timken terminated White. The Court does not find Timken's Drug and Alcohol Policy or its implementation of that policy unreasonable.

In sum, the plain language of Section 10-50 of the CRTA authorized Timken to adopt its Drug and Alcohol Policy, enforce that policy through reasonable and nondiscriminatory drug testing, and terminate White for violating its terms. 410 ILCS 705/10-50(a), (c), (e)(1). White therefore cannot maintain an action against Timken under the IRWPA. 820 ILCS 55/5(a). Timken's motion for summary judgment is granted, and White's motion is denied.

## CONCLUSION

The Court grants Defendant Timken Gears and Services, Inc.'s motion for summary judgment [59], and denies Plaintiff Joseph White's motion for summary judgment [64]. Judgment shall be entered in favor of the defendant and against the plaintiff. Civil case terminated.

Date: July 17, 2024

JEREMY C. DANIEL
United States District Judge